# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs May 6, 2003

## JOYCE M. LINDSEY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-25208     J. C. McLin, Judge**

---

**No. W2002-01967-CCA-R3-PC  - Filed June 10, 2003**

---

The petitioner was originally convicted of second degree murder, aggravated kidnapping, forgery, and theft and received an effective thirty-three-year sentence.  In this appeal from the denial of post-conviction relief, the petitioner argues the post-conviction court erred in finding she failed to establish ineffective assistance of counsel.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert Little, Maplewood, New Jersey, for the appellant, Joyce M. Lindsey.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and John W. Campbell and Thomas D. Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

A Shelby County jury convicted the petitioner of second degree murder, aggravated kidnapping, forgery, and theft.  The trial court sentenced her to an effective term of thirty-three years.  Her convictions and sentences were affirmed on direct appeal.  *See* State v. Joyce M. Lindsey, No. 02C01-9804-CR-00110, 1999 Tenn. Crim. App. LEXIS 1107, at *2 (Tenn. Crim. App. Oct. 28, 1999, at Jackson), *perm. to app. denied* (Tenn. 2000).  The petitioner moved for post-conviction relief alleging her trial counsel failed to adequately investigate her case and  prepare for trial. More specifically, she alleged her attorneys were ineffective for failing to present the testimony of certain family members.  Following a hearing, the post-conviction court found the petitioner failed to establish trial counsels' performance was deficient.  This appeal followed.

## FACTS PRESENTED TO THE JURY

The following facts are taken from this court's opinion on the direct appeal of the petitioner's conviction:

The murder victim, Ashley Lashay Jones, was the defendant's four-year-old niece. The aggravated kidnapping victim, Erica Nicole "Niki" Manning, is the defendant's then twelve-year-old niece. The theft and forgery victim, Vicky Lee Morris, is the defendant's sister. Ms. Morris is the mother of the murder and kidnapping victims.

In September 1996, the defendant's life was in disarray. She was living in North Carolina, where she was in a troubled marriage. The defendant contacted her mother, who lived in Memphis, about going to Memphis to get her life together. Arrangements were made, and on Saturday, September 14, 1996, the defendant checked into a Memphis motel. The defendant called her sister Vicky Morris. The defendant was very intoxicated, and she did not want to see her sister until the following day. At the appointed hour that next day, Ms. Morris went to the motel. Ms. Morris found the defendant drunk and apparently pregnant. Ms. Morris inquired whether the defendant was pregnant, and the defendant affirmed that she was. The defendant agreed to come to the Morris home, where Vicky Morris lived with her husband, Carl Morris, and her children, four-year-old Ashley and twelve-year-old Niki.

. . . .

On the morning of Monday, September 16, Niki left for school. The Morrises left the house for work, and Ashley and the defendant were left alone in the Morris home. Around 9:00 or 9:30 a.m., Ms. Morris called home to check on the defendant and Ashley, and the defendant told Ms. Morris about what Ashley had been doing. Ms. Morris thought she heard Ashley in the background. Following the Morrises' departure from home that morning and Ms. Morris' phone call, Ashley was never seen nor heard from again.

Around 3:15 p.m., Niki arrived home from school and found her Aunt Joyce under the influence of alcohol. When Niki inquired where her sister was, the defendant told her that the baby-sitter had picked up Ashley. Niki phoned a friend, but the defendant was anxious to leave the house and insisted that Niki finish her phone call quickly.

The defendant told Niki that they were going shopping. The pair went in the defendant's vehicle to a gas station, where the defendant used a pay telephone outside Niki's presence. The defendant phoned Ms. Morris and inquired whether she could cash a check at Ms. Morris' bank. Ms. Morris had another call and had to place the defendant on hold before the conversation was complete, and the defendant hung up before Ms. Morris was able to return to the call.

With Niki's assistance, the defendant located Ms. Morris' bank, but she was unable to cash the check she presented. According to Niki, the defendant tried to get

money "out of my mother's bank account." The defendant tried to locate another bank, but she was unsuccessful.

Eventually, the defendant went to a gas station and made some calls on a pay phone. The defendant inquired of Niki whether Ms. Morris would be at home or at work at that time, which was around 4:30 p.m. When Niki told the defendant her mother would be at work, the defendant had Niki call the Morris home and leave a message that they were out shopping. The defendant also told Niki to say that she was trying to talk the defendant into staying in a motel that evening, and the defendant would take Niki to school the following day.

After this phone call, the defendant and Niki began traveling toward Nashville. During this ride, as well as earlier in the afternoon, Niki observed her aunt drinking several bottles of Zima, an alcoholic beverage.

Near Dickson, the defendant's vehicle had a flat tire. An off-duty highway patrol officer stopped to offer assistance. The defendant told him she did not have a spare tire. The officer called a tow truck for the defendant. While they were waiting for the tow truck driver, Niki asked the defendant if she could call her mother, but the defendant told her no.

When the tow truck driver arrived, the defendant told him she did not have a spare tire. Therefore, the driver had to tow the defendant's car. While the driver was getting the defendant's car on the back of his truck, the defendant stood outside on the narrow shoulder of a bridge on Interstate 40 watching the driver. The driver found this unusual, as most women for whom he performs this service wait inside the cab of the truck.

. . .[H]e assisted the pair by taking them to a bank, where the defendant withdrew money with an ATM card, taking them to a fast food restaurant to purchase dinner, and finding them an inexpensive motel room for the evening because all of the tire stores in Dickson were closed. Furthermore, the tow truck driver offered to bring the defendant a tire from his uncle's junk yard the next morning so that he would not have to charge her for towing her to a tire store.

At the motel, the defendant did not want to go inside to check in. She gave the money to the driver and asked him to do it for her. When he came outside and stood at the rear of the defendant's vehicle to get the licence plate number for the motel registration, the defendant got out of the truck and asked what the driver was doing. When the tow truck driver unloaded the defendant's car in the motel parking lot, the defendant watched the driver perform the task.

That night, Niki asked the defendant for permission to call Ms. Morris, but the defendant said, "No, just wait because we'll be back tomorrow." When it was time for bed, the defendant had Niki go outside to get a nightgown from the trunk of

the defendant's car. The car was backed into a parking space outside the motel room door so that the trunk was facing the door. There were bags of clothes in the trunk of the car, and Niki did not look underneath them. The defendant stood in the doorway and told Niki in which bag to find the nightgown.

Shortly after 7:00 a.m. the next morning, the defendant paged the tow truck driver, who brought the junk yard tire and mounted it on the defendant's car. The defendant had the tow truck driver put the old tire in the back seat on top of some clothing, rather than in the trunk. The tow truck driver then went with the defendant and Niki to a tire store, where he spoke with the owner about an inexpensive tire. When the new tire was mounted, the defendant told the mechanic to put the old tire in the back seat, rather than in the truck. Before leaving the tire store, the defendant inquired about the location of a laundromat, and the tow truck driver pointed out one that was down the street.

The defendant and Niki began traveling toward Memphis. In Somerville, the defendant stopped at a discount store and purchased laundry soap, rubbing alcohol and two bottles of bleach. She took Niki to a laundromat and told her to wash the clothes from the back seat of the car. The defendant said she was going to wash the car and left Niki alone at the laundromat. The defendant left the laundry soap with Niki, but she took the bleach with her. About an hour later, the defendant returned to the laundromat, and Niki noticed that the car was not clean. When she asked about this, the defendant told her the line had been too long. The defendant washed some more clothes from the car. While the clothes were washing, the defendant began cleaning out the car. When the defendant opened the trunk, Niki noticed that there was no carpeting inside and there was an odor of bleach. The defendant told Niki she had accidentally knocked over the bleach. Niki also saw a spare tire in the trunk and asked her aunt why they had not used it when they had the flat tire. The defendant said she had forgotten about it. Niki and the defendant loaded all of the clothes back into the car and returned to Memphis.

When they reached the Morris residence at about 4:00 p.m., the defendant let Niki out but drove away. When Niki came in the house, Vicky and Carl Morris, who had by this time alerted the authorities that both Ashley and Niki were missing, inquired about Ashley. Niki reported what the defendant had told her, that Ashley had been picked up by the baby-sitter. Ms. Morris knew this could not be true, because either she or her husband transported Ashley to and from the baby-sitter each day. Ms. Morris instructed her husband to chase down the defendant, and Ms. Morris called 911.

Carl Morris was able to locate the defendant and bring her back to the house. A police officer arrived, and he observed the defendant make attempts to get to her car. Because emotions were high, the officer had to separate the Morrises and Niki from the defendant by placing the defendant in the back seat of his patrol car. Later, the officer discovered a loaded .45 semi-automatic pistol which was cocked and in

4

a locked position inside the defendant's purse, which had been inside the defendant's car. The defendant was arrested that evening for kidnapping Niki. The defendant's car was towed to a secure location that evening. The officer recalled having opened the trunk of the car and smelled a very strong bleach odor.

A subsequent search of the defendant's car revealed a box of checks which belonged to Ms. Morris, a check book belonging to Ms. Morris, a check written on Ms. Morris' account made payable to the defendant and bearing Ms. Morris' name in the signature field in the defendant's handwriting, and Ms. Morris' class ring. More significantly, blood spatters were discovered in the trunk of the vehicle. Subsequent DNA testing of samples taken from the spatters was performed in conjunction with testing of samples of Ashley Jones's mother's and father's blood. According to the state's expert from the Tennessee Bureau of Investigation, the probability that the blood spatters came from a biological child of Ashley Jones's mother and father was 99.9 percent. Ashley was the only child of Ms. Morris and Brian Jones, the father.

While the defendant was in pre-trial detention, she wrote letters to a male inmate. In a letter dated May 15, 1997, she wrote, "I just came from being charged with 2nd degree murder, there was a blood spots the size of a quarter where Ashley cut her fingers." In a letter dated June 25, 1997, the defendant wrote,

> You See the 4 year old & I went to the store & she cut her hand on Broken Glass behind my seat I took & wrap her hand in a Blanket Until it stop Bleeding & then put the Blanket in the trunk Ashley kept pushing the trunk Button in the glove Box & it was raining and storming Bad the Blanket Flapped against the trunk lid leaving Blood spot that you can't see with your eyes its microscopic. Because they could not find her & she was abducted Alan they charged me with murder.

In an undated letter, the defendant wrote, "The liner of my trunk (Rubber Seal) has Spots of blood on it. Can they charge me with murder without a body? I haven't murder Any one Ashley cut her hand on Glass in my car & she was swing her arms every which way."

At trial, Vicky Morris testified about a possible motive for the crimes. According to Ms. Morris, she was a single parent in the summer of 1989 when she was asked by the Department of Human Services to accept temporary custody of Tammy, the defendant's five or six-year-old daughter. Ms. Morris was promised financial assistance from DHS for Tammy, but she never received any. Because maintaining both Niki and Tammy and paying for their day care on her meager income was impossible, she surrendered Tammy back to DHS after about a month. Tammy was placed in a foster home, and eventually, her father was awarded custody through judicial proceedings. In February 1996, the defendant was in Memphis to

5

transport her sister Teresa to Asheville, North Carolina. She and Ms. Morris saw each other, and the defendant was very cold to Ms. Morris. Two months later, in April 1996, the defendant told Ms. Morris during a phone conversation that her behavior in February had been occasioned by Ms. Morris having ruined her life by assisting Tammy's father in gaining custody of the child. The defendant became very emotional during this conversation. Ms. Morris tried to explain why she had surrendered temporary custody of Tammy back to DHS and that she had not assisted Tammy's father in pursuing custody. Finally, Ms. Morris testified that when Tammy was four, she bore a strong resemblance to Ashley at the same age.

In response to the state's proof, the defense offered the testimony of an expert in interpretation of DNA autoradiograms who challenged the state's DNA evidence. This expert conceded that DNA from the blood found in the defendant's trunk was consistent with the offspring of Ashley's mother and father; however, he opined that the probability of this DNA being consistent with "a lot of people" was much higher than was advanced by the state's expert. He opined the DNA pattern was found in one in forty unrelated people, and he opined that the frequency would be even greater among related individuals. Furthermore, he found other samples which the state contended were consistent with the offspring of Ashley's parents either inconclusive or too degraded for use.

Joyce M. Lindsey, 1999 Tenn. Crim. App. LEXIS 1107, at **3-15 (footnotes omitted).

**PROOF AT THE HEARING**

At the post-conviction relief hearing, the petitioner presented the testimony of four family members whom she claimed should have testified for the defense at trial. The petitioner's father, Ralph Manning, testified the petitioner was employed at the time of her visit to Memphis and that he gave her $300 just prior to her trip. He further indicated the petitioner had been awarded custody of her daughter Tammy, and there was no animosity between the petitioner and her sister Vicky Morris as a result of the custody dispute. Manning further testified his fingers bled in the trunk of the petitioner's car, and this may have explained the presence of blood in the trunk. He said he made repeated efforts to contact trial counsel by telephone, but they never returned his calls.

Brenda Alvarez, the older sister of Vicky Morris and the petitioner, testified there was no animosity between Morris and the petitioner. Alvarez further stated Morris indicated prior to trial that she planned to concoct evidence regarding the petitioner's motive for committing the crimes. The petitioner's step-mother, Gloria Manning, testified there was no indication of hostility between Morris and the petitioner during a meeting which occurred after the alleged custody dispute.

Mary Ridley, the mother of the petitioner and Morris, also testified there was no hostility between her daughters prior to the child's disappearance. Ridley further stated that she informed trial counsel of an alleged incident that occurred in Morris' neighborhood on the day of the disappearance in which a neighbor allegedly heard a man shout at a child to get in a car. Ridley also said she observed an officer pick up a doll and place it in a bag. According to Ridley, the doll was

not taken from the petitioner's car as was stated by a prosecution witness. Ridley said she also told trial counsel the petitioner's description of the person who took Ashley Jones matched that of the girl's former babysitter.

A member of the petitioner's defense team testified for the state. He stated he was one of three attorneys who represented the petitioner at trial. According to trial counsel, the defense team received full discovery from the state, met often with the petitioner to discuss her case, retained defense experts, and explored potentially exculpatory information. He testified they discussed the testimony available from potential witnesses and "whatever witnesses were called or were not called were the basis of a joint decision after hours of discussion."

Trial counsel indicated Ralph Manning refused to cooperate with the petitioner's defense at trial. Trial counsel further testified the defense team interviewed Brenda Alvarez and Mary Ridley. He stated some of the information provided by Brenda Alvarez was contradictory, and, therefore, they and the petitioner made a joint decision not to call her as a witness. He stated they investigated the information provided to them by Mary Ridley. He said the petitioner joined in the decision not to present Ridley's testimony.

The petitioner did not testify at the post-conviction hearing.

## POST-CONVICTION COURT'S FINDINGS

The post-conviction court filed exemplary written findings of fact and conclusions of law. It accredited the testimony of trial counsel and found the petitioner's trial attorneys conducted discovery, hired defense experts, met frequently with the petitioner, adequately investigated her case, and advised the petitioner regarding her case. It found trial counsel were unable to utilize Ralph Manning because he was uncooperative. It further found trial counsel made strategic decisions with the participation of the petitioner not to present the testimony of the other family members. Therefore, it concluded petitioner failed to establish trial counsels' performance was deficient.

## STANDARD OF REVIEW

The post-conviction judge's findings of fact on post-conviction hearings are conclusive on appeal unless the evidence preponderates otherwise. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). Those findings of fact are afforded the weight of a jury verdict, and this court is bound by the findings unless the evidence in the record preponderates against those findings. Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

## INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends the post-conviction court erred in its determination that she failed to prove ineffective assistance of counsel. We do not agree. This court reviews a claim of ineffective assistance of counsel under the standards of Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), and Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner has the burden to prove that (1) the attorney's performance was deficient, and (2) the deficient performance resulted in prejudice to the defendant so as to deprive him of a fair trial. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

The test in Tennessee to determine whether counsel provided effective assistance is whether his or her performance was within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. The petitioner must overcome the presumption that counsel's conduct falls within the wide range of acceptable professional assistance. Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; Honeycutt, 54 S.W.3d at 769. Therefore, in order to prove a deficiency, a petitioner must show "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065).

In reviewing counsel's conduct, a "fair assessment . . . requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002) (citing Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. Henley, 960 S.W.2d at 579; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

**ANALYSIS**

In the instant case, the post-conviction court specifically accredited the testimony of trial counsel, which indicated petitioner's father refused to cooperate and that the petitioner joined with trial counsel in deciding whether to present the testimony of her mother and her sister, Brenda Alvarez. Trial counsel's testimony further indicated that the petitioner was involved in all decisions regarding whether to present the testimony of each potential witness, and the decision not to use them was strategic. Further, the proof established that trial counsel conducted an extensive investigation into the facts surrounding the petitioner's case, thoroughly examined every possible theory of defense, and made informed strategic decisions regarding the evidence to be presented at trial. The evidence presented at the post-conviction hearing does not preponderate against the trial court's findings.

8

Further, even if counsel's performance had been deficient, there has been no showing that the alleged deficiencies prejudiced the petitioner. At trial, the state presented proof there was a 99.9 percent probability the blood found in the petitioner's trunk was the blood of Ashley Jones. Furthermore, Vicky Morris' testimony regarding the petitioner's possible motive did not appear to have been the most crucial evidence against the petitioner. The state presented overwhelming testimony that the petitioner was the last person to have seen the four-year-old child, that she took Vicky Morris' twelve-year-old daughter from the home without permission, and engaged in extremely suspicious behavior. We conclude that even if the testimony presented by the petitioner at the post-conviction hearing had been presented at trial, the petitioner has failed to establish a reasonable probability that the verdict would have been different. Therefore, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE